UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 21-207(2)(NEB/LIB)

UNITED STATES OF AMERICA,

Plaintiff,

v.

**GOVERNMENT'S TRIAL
BRIEF**

(2) DOUGLAS EDWARD McCLENDON,

Defendant.

The United States of America, by and through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, Laura M. Provinzino, Assistant United States Attorney, and Angelica D. Ramirez, Special Assistant United States Attorney, hereby submits this trial brief outlining the evidence the Government intends to produce at trial and certain issues that may arise during trial. The Government respectfully requests the opportunity to supplement this brief and other trial documents as necessary to respond to defense arguments and other developments prior to trial.

## BACKGROUND

### I.  Trial Counsel

The following is a listing of the names, addresses, telephone numbers and e-mail addresses of the attorneys who will appear as trial counsel in the case:

| For the Government | For the Defendant |
|---|---|
| Laura Provinzino<br>300 South 4th Street, Suite 600<br>Minneapolis, MN  55415<br>612-664-5600 | Kevin O'Brien<br>7101 York Avenue South, Suite 340<br>Edina, MN 55435 |

laura.provinzino@usdoj.gov                    612-237-9510
                                               koblaw@aol.com
Angelica Ramirez
300 S. 4th Street, Suite 600
Minneapolis, MN  55415
612-664-5600
angelica.ramirez@usdoj.gov

## II.      Length Of Trial

The Government anticipates that its case-in-chief can be presented in three-to-four days.   Allowing for jury selection, jury charge, and a possible defense case, the Government believes that the five days allotted in the Court's prior order should be sufficient time to complete the trial.

## III.     Charges Against the Defendant

Douglas Edward McClendon is charged by Indictment with one count of conspiracy to distribute fentanyl and other controlled substances in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846. This count relates to evidence of a drug conspiracy over a short period of time in March 2021 that resulted from the execution of a search warrant at the Best Western Hotel in Bemidji, Minnesota, on March 12, 2021.

## IV.     Elements of the Charged Offense

The crime of conspiracy to distribute fentanyl and other controlled substances, as charged in Count 1 of the Indictment, has four elements, which are:

*One*, on or about March 2, 2021, and continuing through in or about March 12, 2021, two or more persons reached an agreement or came to an understanding to possess with intent to distribute, and to distribute a mixture of a substance containing a detectable

amount of fentanyl, Nphenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, a controlled substance, and other controlled substances, to include quantities of mixtures and substances containing a detectable amount of methamphetamine;

*Two*, the defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect;

*Three*, at the time the defendant joined in the agreement or understanding, he knew the purpose of the agreement or understanding; and

*Four*, the agreement or understanding involved 40 grams or more of a mixture of a substance containing a detectable amount of fentanyl, Nphenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide.[1]  *See* Model Criminal Jury Instructions for the Eighth Circuit, § 6.21.846A.1; 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846.

## A.    Anticipated Facts at Trial[2]

Magistrate Judge Brisbois' February 9, 2022 Report & Recommendation to deny Defendant's suppression motion, *see* ECF No. 63 ("R&R") at 7–10, as well as the

---

[1] This fourth factor must be found for the statutory mandatory term of imprisonment to apply, but the defendant may still be found guilty of conspiracy to distribute fentanyl and other controlled substances without it.  The Government has offered language related to the necessary jury finding for this enhancement in its proposed jury instructions and verdict form.  *See Alleyne v. United States*, 570 U.S. 99, 116 (2013).

[2] The factual summary provided, given upon information and belief, is not intended to be a full description of the Government's evidence in this case.  It is provided in order to give the Court sufficient information to consider the Government's motions *in limine*. The United States respectfully reserves the right to supplement its trial brief or its motions *in limine* in advance of the June 13, 2022 pretrial conference in light of upcoming meetings with witnesses and in response to Defendant's filings.

government's pre-hearing and post-hearing briefing, set out the basic facts of this case. The Government anticipates that the evidence at trial will establish the following:

### i. Warrant Execution at the Best Western in Bemidji Minnesota on March 12, 2021

At the beginning of 2021, the Paul Bunyan Drug Task Force (PBDTF) responded to more than 20 fentanyl overdoses in Beltrami County, Minnesota, including fatalities that were investigated as homicides. On March 12, 2021, the PBDTF received a tip from Cynthia Tesar, a concerned citizen, who was working at the Best Western in Bemidji. Tesar reported she had observed at least three African-American males occupying Rooms 111 and Room 124 and believed they were working together to sell drugs. She observed several indications of drug trafficking: an abundance of short-term traffic in and out of the rooms, drug packaging material and paraphernalia in Room 124, and association between the room occupants both in each other's rooms and outside of the rooms. Ms. Tesar also saw someone leave Room 124 and say, "They have whatever you want." On the same day, Commander Joe Kleszyk received information from a confidential reliable informant ("CRI"), who corroborated the concerned citizen's information that an African-American male in room 124 was selling drugs, including fentanyl.

Based on his own experiences with drug trafficking in hotel rooms, the uptick of fentanyl overdoses in the area, and the information received from the informants, Commander Kleszyk applied for and received a warrant to search Rooms 111 and 124. Commander Kleszyk and a team of task force officers (TFOs) with the PBDTF executed the warrant in the evening of March 12, 2021. The TFOs organized into two teams to

search each room.  Both rooms were located on the first floor of the Best Western. Commander Kleszyk led the search team for Room 111, and Justin Erickson led the search team for Room 124.

As captured on body worn camera footage, the TFOs knocked on both doors at approximately the same time.  A male voice responded at Room 111, but no one came to the door. Similarly, a male voice responded at Room 124, but no one came to the door. Commander Kleszyk attempted to open Room 111 with a key card, but it failed.  After several attempts at getting occupants to open the doors, the TFOs announced police presence and eventually forced their way into each room.

When Erickson and several other TFOs entered Room 124, an African-American male, Christopher Richard, was identified and placed under arrest.  When Commander Kleszyk and several other TFOs entered Room 111, the room was empty.  The street-level window was open and separate sets of footprints led away from the hotel in different directions.  TFOs immediately ran outside but were unable to locate any suspects.  Officers obtained various tips from onlookers and pursued those tips with no success.  A TFO attempted to search a nearby wooded area with a trained K9 for the occupants of Room 111 but was unsuccessful.

While the search for the suspects continued, Commander Kleszyk conducted an initial search of Room 111, which appeared to have been occupied by several individuals. The search uncovered a wallet containing photo identification for Douglas Edward McClendon inside a distinct tan Dickies jacket, a wallet containing photo identification for Ashton Lavonne Carson inside a green jacket, and a wallet containing photo identification

5

for Scot Lamont Watkins.  Officers photographed the identifications and distributed them by text to all officers responding to the scene.  TFO Ricky Wuori and others searched a nearby Walmart and identified a suspicious male matching the identification of Watkins. TFO Wuori pursued the individual, but he was able to evade law enforcement.  To date, Watkins has not been arrested by law enforcement on the indictment.  Watkins is believed to be in the Detroit area.

Room 124 was relatively clean compared to Room 111.  Room 124 contained one suitcase with male clothing and a single Styrofoam food container.  TFO Erickson observed a Morton Salt container and Pringles can near the TV, which was otherwise free of items. Common to drug trafficking, the Morton Salt container had a false bottom but was empty inside.  The Pringles can also had a false bottom containing three items: (1) a clear plastic bag with a crystal-like substance which field-tested for methamphetamine;[3] (2) a clear plastic bag containing 37 blue pills stamped with an "M" on one side and "30" on the other;[4] and (3) a clear plastic bag containing a white powder-like substance which field-tested for fentanyl.[5]  TFO Clayton Allard searched the ceiling tiles in the bathroom of Room 124 and found $1,920 in cash and a bag containing a white powder-like substance which field-tested for fentanyl.[6]  He shared this information with the team searching Room 111.

_____

[3] Agency item No. 21-00166 laboratory tested positive for methamphetamine and weighed approximately 27 grams.
[4] Agency item No. 21-00167 tablet laboratory tested positive for fentanyl, 4-anilino-N-phenethylpiperdine (fentanyl precursor).
[5] Agency item No. 21-00168 laboratory tested positive for cocaine, less than 4 grams.
[6] Agency item No. 21-00169 laboratory tested positive for methamphetamine, heroin, fentanyl, 4-anilino-N-phenethylpiperdine, approximately 69 grams.

TFOs also located an Arizona tea container with a false bottom in the mini fridge, a red iPhone, a black iPhone, and a box of sandwich bags in Room 124. Richard stated that the red iPhone belonged to him. TFOs observed the black iPhone ring repeatedly with an incoming call from "white girl." Around the same time, TFOs observed Marta Valencia walking toward Room 111, but she turned around as soon as sh]e saw law enforcement. Valencia returned to the hotel lobby and her interaction with law enforcement was captured on body worn camera. Valencia said she was heading to the wrong room and was there to visit room 110. (The Best Western General Manager, Dilip Patel, verified that Room 110 was not occupied at the time.) Best Western video surveillance shows Valencia entering Christopher Richard's Room 124 on a previous day. In the video surveillance, McClendon walks past Room 124 as Valencia exits, they look at each other, and McClendon walks back into Room 124.

In contrast, Room 111 was found in relative disarray. In addition to a green jacket, a tan Dickies jacket, and three wallets containing photo identification for McClendon, Watkins, and Carson, TFOs located two bright blue duffle bags in separate areas of the room, items of male clothing, several Styrofoam food containers and plasticware, cigarette packs located on separate sides of the room, a gaming system, and other personal belongings indicating more than one person was staying in Room 111. TFOs found $133 in cash in Carson's green jacket and $501[7] in cash in McClendon's tan Dickies jacket. Additionally, officers located common tools of the drug trafficking trade: a small blender,

---

[7] The original amount was listed as $433, but currency logs show the actual dollar amount to be $501.

a scale, air fresheners, sandwich bags, a red iPhone in a black case with an incoming
message asking, "do you have my gun," a JEFE brand cannabis bag containing a smaller
bag with 68 blue pills stamped with an "M" on one side and "30" on the other,[8] and a ripped
off corner of a sandwich bag containing white residue.   TFOs also searched the bathroom
ceiling tiles in Room 111 and located a plastic bag containing a tan powder-like substance
which field-tested positive for fentanyl,[9] a second plastic bag with a similar tan powder-
like substance,[10] a plastic bag with a rock-like substance,[11] a plastic bag with a crystal-like
substance which field-tested positive for methamphetamine,[12] and a plastic bag that did not
field-test for controlled substances.[13]

   In a trash container in Room 111, TFOs recovered two Walmart2Walmart money
transfer receipts from Douglas McClendon to Quantika Greenly[14] in Michigan, both dated
March 7, 2021.   Receipt 783548711 shows $1000 was sent on March 7 2021 at 1:23 pm
(but was canceled at 2:52 pm).   Receipt 993539597 shows $500 was sent on March 7, 2021
at 2:57 pm.   (The case agent, Justin Erickson, has served a trial subpoena duces tecum for

---

[8] Agency item No. 21-00155 tablet laboratory tested positive for fentanyl.
[9] Agency item No. 21-00159 laboratory tested positive for a mixture of fentanyl,
tramadol, 4-anilino-N-phenethylpiperdine, 76.89 grams.
[10] Agency item No. 21-00160 laboratory tested positive for heroin, 14.93 grams.
[11] Agency item No. 21-00161 laboratory tested positive for methamphetamine, fentanyl,
tramadol, 4-anilino-N-phenethylpiperdine, and fluorofentanyl (fentanyl analogue), 15.88
grams.
[12] Agency item No. 21-00162 laboratory tested positive for methamphetamine, 11 grams.
[13] Agency item No. 21-00163 laboratory testing identified no controlled substances.  This
unknown substance, 45.84 grams, is likely to be "cut" which is used to dilute controlled
substance to expand profits.
[14] According to defendant and as documented in the U.S. Probation and Pretrial Services
bond report, Quantika Greenly is McClendon's girlfriend of 10 years with whom he
resides with their shared children.

8

additional Walmart2Walmart records for McClendon and other members of the conspiracy but has yet to receive a response.)

### ii.   Forensic Analysis by the BCA of the Physical Evidence for Controlled Substances, Latent Fingerprint, and DNA Testing

Commander Joe Kleszyk and TFO Justin Erickson photographed and secured the evidence found in Rooms 111 and 124.   TFO Erickson submitted a laboratory analysis request to the Minnesota Bureau of Criminal Apprehension (BCA) for testing of the controlled substances and packaging.   BCA Forensic Analyst Amy Granlund determined that the substances in the false container in Room 124, including the blue tablets, contained mixtures of methamphetamine, fentanyl, heroin, and cocaine. The substances found in the ceiling tiles of Room 124 contained mixtures of methamphetamine, heroin, and fentanyl. Analyst Granlund determined that the substances found in the ceiling tiles of Room 111 contained methamphetamine, heroin, and tramadol.   The blue tablets found in Room 111 contained fentanyl.   In total, the amount of fentanyl in each room exceeded 40 grams.

The plastic bag containing blue fentanyl M-30 pills inside the Jefe cannabis bag found in Room 111 was submitted for DNA analysis.   BCA Forensic Scientist Michelle Nelson compared the predominant male DNA profile with a national DNA database.   The database returned a positive hit for Scot Watkins.   According to best practices within the BCA, the results are not considered evidentiary because a known sample from Watkins was not submitted due to his whereabouts still being unknown.   The parties anticipate a stipulation and a limitation to the scope of FS Nelson's testimony to avoid any unwarranted

prejudice from the identification of Watkins from a national DNA database drawn from criminal convictions.

None of the items submitted for latent print analysis resulted in positive identification matching any of the conspirators.

### iii.        Forensic Analysis of the Phones Founds in Room 111 and Room 124

On March 15, 2021, TFO Erickson submitted two phones found in Room 111 and two phones found in Room 124 for forensic extraction by the Minnesota BCA.  Special Agent William Bennett successfully extracted data from the Room 111 phones but was not able to extract data from the Room 124 phones.  Those were submitted to the Federal Bureau of Investigation for additional analysis.[15]

The data extraction from the black iPhone located in Room 111 has douglasmcclendon58@yahoo.com as the Apple ID and an associated phone number of 313-627-7744.  The phone contained several "selfie" photographs of McClendon wearing a tan Dickies jacket, travel information, hotel reservation emails from Best Western and AmericInn in Bemidji, Minnesota, and location data for Bemidji.  Group photographs of Watkins and McClendon were also located.

The data extraction from the red iPhone located in Room 111 has scotwatkins88@gmail.com as the Apple ID and an associated phone number of 586-422-4439.  (McClendon's phone lists Watkins' phone number as "The Most.")  The phone

---

[15] Only recently was the FBI able to get into one of Richard's phones.  While the data has been provided to McClendon, the government is still identifying and creating a handful of exhibits to use at trial that show McClendon and Richard in the same locations during the conspiracy and the scope of their communication.

contained several "selfie" photographs of Watkins, including a photo where his photo identification and birth certificate are prominently displayed, where he is wearing a black and orange flannel hoodie, and where he displays large amounts of cash.  Photos of Christopher Richard and location information for Bemidji are also found.

Each phone contains messages between Watkins and McClendon, including a message from McClendon on March 2, 2021, stating, "Oh yeah we do got something for ya cum down in get yo dope in sell it playa."  On March 7, Watkins responds asking for an address.  On March 9, McClendon provides an address to the DoubleTree Hotel by Hilton in Bemidji.  On March 11, a video of a woman smoking vapors from tin foil, a common method of ingesting controlled substances was exchanged by Watkins and McClendon.

### iv.    Business Records Evidence from Bemidji Area Hotels.

TFO Erickson subpoenaed hotel records in Bemidji involving Richard, McClendon, Watkins, and Carson.  The records provide details about the conspirator who rented the room, including home address and phone number, number of occupants, and payment method.   All records have subsequently been certified as business records with accompanying Rule 902(11) certificates, which have been provided to McClendon.  As such, the government does not intend to call records custodians for the hotel documents.

- Richard had a reservation at Candlewood Suites on March 2, 2021 through March 4, 2021.

- Richard had a reservation at AmericInn Bemidji on March 5, 2021 through March 7, 2021 for Room 111.

- McClendon had a reservation at AmericInn Bemidji on March 8, 2021 for the same room number--Room 111. Hotel surveillance gathered from the AmericInn place McClendon and Richard at the AmericInn during those dates.

- McClendon had a reservation at the DoubleTree by Hilton in Bemidji on March 9, 2021 at 7:56 am for Room 258 and a second reservation the same day at 7 p.m. for Room 252.

- Richard had a reservation at the Best Western on March 10, 2021 through March 12, 2021 for Room 124 and on March 11, 2021 for Room 111.

- McClendon had a reservation at Best Western on March 10, 2021 and March 12, 2021 for Room 111. Hotel surveillance place McClendon, Richard, Watkins, and Carson in the Best Western during those dates.

v.  **Defendant's Prior Convictions for Controlled Substance Crimes**

On February 11, 2019, Douglas McClendon pled guilty to delivery of a controlled substance (heroin) and possession with intent to deliver a controlled substance (cocaine) in Monroe County, West Virginia. On April 15, 2019, McClendon was sentenced to a term of imprisonment of one to fifteen years in West Virginia State Penitentiary. The government has obtained certified copies of the conviction documents and the case file from DEA TFO Mark Trump, who investigated the case against McClendon. The facts leading to the conviction are set out below.

Detective Trump was investigating drug sales at a local apartment based on information from a confidential reliable informant (CRI). On May 15, 2018, the CRI told

Detective Trump that s/he had purchased heroin and crack at a local motel from Detroit dealers. On May 31, 2018, the CRI purchased cocaine from the dealers and reported that they were moving from the hotel to a local apartment. Detective Trump drafted a warrant for the named apartment.

While executing the warrant, McClendon attempted to flee through a window but was stopped by perimeter security. Officers located controlled substances in the apartment, including 22 grams of fentanyl. According to the apartment owner, McClendon had been staying in her apartment for only two days and was there with his partner to sell drugs. McClendon was working with two other individuals in her apartment to deliver the drugs to the customers.

The search warrant, police reports, laboratory report, indictment, guilty plea, plea order, and sentencing order for Case Numbers 18-F-347 and 18-F-346 have been provided to defense counsel. The government maintains the original certified copies of the complaint, plea agreement, and judgment and has designated these as trial exhibits. McClendon was incarcerated from approximately February 2019 to November 2019 as a result of the offense and remained on parole for the West Virginia conviction during the time of the instant offense.

## V.      TRIAL PRESENTATION AND EVIDENCE

The government will work efficiently to present to the jury the facts necessary to establish the elements of the conspiracy offense alleged. To that end, the government will provide evidence describing the conspiracy, law enforcement actions, and subsequent investigation, in chronological order to the extent possible.

13

In addition to testimony necessary to elicit the government's evidence on elements of the controlled substances offense, the government's presentation will begin with the initial tip to law enforcement; the March 12, 2021 execution of the search warrant on Room 111 and Room 124, including video recordings of the officers' forced entry and what they immediately perceived; items gathered during the seizure, such as identifications, cash, Walmart2Walmart transfer receipts, controlled substances; still images obtained by various means; phone content (including text message, location information, call logs, and other relevant items); certified business records from various hotels and the Bemidji Walmart (including surveillance and still images from Walmart); and expert testimony regarding controlled substance testing, cellular phone forensic analysis, DNA analysis; and testimony by Special Agent Michael Flanagan of the BCA regarding the operations of conspiring drug traffickers and illegal controlled substance distribution generally.

As described above, the government will attempt to give the jury a relatively chronological presentation of the facts of the case.  The government does not intend to introduce any post-conspiracy statements made by co-conspirators.

### A.   The Government's Presentation Will Not Include Chain of Evidence Testimony Except as Necessary for Admissibility

The government has provided defense counsel with the chain of custody for all physical items of evidence from Rooms 111 and Room 124, including the controlled substances.  The case agent TFO Erickson and Commander Kleszyk will cover chain of custody and there is no need to call unnecessary witnesses for such evidence.  "For purposes of admissibility, the court presumes that the custodians have preserved the

integrity of such evidence, unless there is a showing of bad faith, ill will, or proof that someone has tampered with the evidence." *United States v. Brumfield*, 686 F.3d 960, 965 (8th Cir. 2012) (quoting *United States v. Miller*, 994 F.2d 441, 443 (8th Cir. 1993)).  The government will present sufficient evidence for purposes of foundation, admissibility, and chain in regard to physical evidence, noting that testimony from a witness for each step in the chain is not necessary.  *See, e.g.*, *United States v. Pressley*, 978 F.2d 1026, 1028–29 (8th Cir. 1992):

> The government is not required to maintain an eternal vigilance over all evidence in its custody. It is enough for its admissibility if the judge is satisfied that the relevant article has not, in all reasonable probability, been changed in any important respect.

*See also Brumfield*, 686 F.3d at 965. "Any defect in the chain of custody typically affects the weight of the evidence rather than its admissibility." *United States v. Briley*, 319 F.3d 360, 363 (8th Cir. 2003).  The government will present multiple law enforcement, business records, phone records, and civilian witnesses to address these facts with the jury.

## B.    Conspiracy Evidence

A conviction for conspiracy to distribute a controlled substance under 21 U.S.C. § 846 requires the government to prove that: (1) a conspiracy to distribute the controlled substance existed; (2) the defendant knew about the conspiracy; and (3) the defendant knowingly became a part of the conspiracy.  *United States v. Anwar*, 880 F.3d 958, 967 (8th Cir. 2018); *United States v. Garcia*, 646 F.3d 1061, 1066 (8th Cir. 2011) (conviction of a conspiracy to distribute methamphetamine); *see also United States v. Boykin*, 794 F.3d 939, 948 (8th Cir. 2015) (conviction of a conspiracy to distribute marijuana).  Under federal

law, even individuals "with limited roles in a conspiracy are considered principles" and need not know everything about the planned crime. *United States v. Morales*, 813 F.3d 1058, 1065 (8th Cir. 2016). The defendant need not even know the "exact nature" of the controlled substance, but "only that it was a controlled substance of some kind." *Anwar*, 880 F.3d at 967 (quoting *Morales*, 813 F.3d at 1065 and *United States v. Martin*, 274 F.3d 1208, 1210 (8th Cir. 2011)). This is a conspiracy case against McClendon built on indirect evidence and inferences from hotel, phone, drug, financial, surveillance, and other evidence.

The government can demonstrate participation in a drug conspiracy in a variety of ways. In the absence of direct evidence, the jury may consider all direct and indirect evidence and draw reasonable inferences from this evidence about the defendant's state of mind when he said or did the things presented in the evidence. *Boykin*, 794 F.3d at 948. Moreover, the conspiracy's structure may be "'a loosely knit, non-hierarchical collection of persons who engaged in a series of transactions involving distribution-quantities . . . in and around' a particular city over a course of time." *United States v. Conway*, 754 F.3d 580, 587 (8th Cir. 2014). Meanwhile, an agreement to join a conspiracy "need not be explicit but may be inferred from the circumstances of the case," and a defendant may be convicted "for even a minor role in the conspiracy." *Id*. A common conspiracy can be proven "even if some participants are unknown to other conspirators or uninvolved in some transactions." *United States v. Perez-Trevino*, 891 F.3d 359, 372 (8th Cir. 2018) (citing *United States v. Longs*, 613 F.3d 1174, 1176 (8th Cir. 2010)).

The jury will hear evidence regarding the investigation leading up to the March 12, 2021 search warrant, the execution of the warrant and seizure of various items of evidence, and McClendon's statements to other co-conspirators and association with other co-conspirators through hotel documents and surveillance records, all of which indicate conspiratorial activity. These and other forms of evidence will demonstrate to the jury beyond a reasonable doubt that McClendon is guilty of the conspiracy to distribute drugs.

### C.    Narcotics Evidence, Jury Instructions, and Verdict Form

Law enforcement seized several packages containing controlled substances from Rooms 111 and 124 on March 12, 2021. The parties have begun discussions regarding potential stipulations, including the results of testing for particular controlled substances. Regardless, due to the poly-substance nature of the seizure, the government anticipates providing evidence through expert and other witnesses confirming that certain recovered materials are fentanyl, methamphetamine, and other controlled substances as defined by 21 U.S.C. § 841.

The government may introduce testimony regarding the results of any relevant field testing. Any such testimony will only occur after the witness has confirmed whether he or she has received formal training and previously had experience field-testing narcotics, and that he or she followed correct procedures in field testing the substance in that instance.[16]

---

[16]    An "experienced agent familiar with field test[ing]" is "competent to testify concerning the results of the test he conducted." *United States v. Eisler*, 567 F.2d 814, 816 (8th Cir. 1977) (citing *United States v. Hampton*, 507 F.2d 832 (8th Cir. 1974), *aff'd* on other grounds, 425 U.S. 484 (1976)).

Furthermore, the government will also provide testimony from a forensic scientist to confirm that the relevant substances seized on March 12, 2021, were various types of controlled substances, as alleged in the Indictment. That testimony will also demonstrate the amounts of respective controlled substances.

As to the conspiracy allegation at Count 1, the special verdict form first directs the jury to indicate whether they have unanimously found that the conspiracy involved fentanyl or methamphetamine. If the jury finds that the conspiracy involved fentanyl, the verdict form also inquires as to the quantity of fentanyl they have unanimously found to support a mandatory minimum sentence of five years. *See Alleyne v. United States,* 570 U.S. 99, 116 (2013) ("[A]cts that increase mandatory minimum sentences must be submitted to the jury.").

## VI.   ANTICIPATED EVIDENTIARY AND LEGAL ISSUES

The following sections support the government's motions in limine. This is an outline of some of the evidence the government anticipates offering at trial and the government's plan for introducing it, as well as a preview of other evidentiary issues that may arise.

### A.   Business Records—Federal Rules of Evidence 803(6), 902(11), and 902(13)

The United States will introduce into evidence various forms of hotel and Walmart records generated as business records and by an electronic process or system, pursuant to Federal Rules of Evidence 803(6), 902(11) and 902(13). Certifications for hotel and Walmart records have been disclosed and made available to defense counsel pursuant to

Rules 803(6), 902(11), and 902(13).  Thus, all hotel records and Walmart records are self-authenticating and require no extrinsic evidence of authenticity to be admitted.

**B.    Federal Rule of Evidence 701 Testimony by Hotel General Manager**

To better inform the jury, Dilip Patel, the General Manager of the Best Western Hotel will provide testimony regarding record and customer identification practices of the Best Western Bemidji Hotel and hotels in Bemidji generally based on his experience as a hotel general manager for several years.  This includes the customer providing a photographic identification and other address and telephone contact information.

**C.    Certain Non-Hearsay Evidence is Admissible to Demonstrate Why Law Enforcement Acted Lawfully and Appropriately.**

The government has subpoenaed former Best Western housekeeper Cynthia Tesar to testify regarding her tip to law enforcement.  The government anticipates she will testify to the association between several African-American men, frequent foot-traffic in the area, and indicia of drug use and trafficking in Best Western Rooms 111 and 124.  If she becomes unavailable for any reason, however, the government plans to introduce her tip through law enforcement at trial to show the jury the genesis of the narcotics investigation.  Similarly, the government intends to introduce the confidential reliable informant's tip to law enforcement used to obtain the search warrant for those same reasons and to show corroboration.  Generally speaking, courts do not view tips as hearsay; instead such information is non-hearsay evidence used to explain why law enforcement focused its investigation in a particular way or how and why the investigation was initiated.  *See, e.g.*, *United States v. Malik*, 345 F.3d 999, 1001 (8th Cir. 2003) (quoting *United States v. Davis*,

19

154 F.3d 772, 778 (8th Cir. 1998) ("An out-of-court statement is . . . not hearsay if it is offered, not for the truth of the matter asserted, but instead to explain the reasons for or propriety of a police investigation")).

For example, in *United States v. Brown*, the Eighth Circuit upheld the admission of a tip for precisely this purpose. 923 F.2d 109 (8th Cir. 1990).  In *Brown*, a detective received a phone call informing him that Williams and another man were selling drugs from a "newer model gray Volvo automobile at a local apartment complex."  *Id*. at 110. The detective observed a gray Volvo at the apartment complex that matched the description with Williams in the driver's seat and defendant Brown in the passenger seat.  *Id*. The detective watched as another pair walked up to the car and interacted with Brown and Williams in ways indicating drug deals.  *Id*.

In affirming the admission of the original tip, the Eighth Circuit rejected the challenge that it was improper hearsay:

> Brown and Williams contend the district court improperly admitted the detective's testimony about his telephone conversation with the anonymous informant because it was hearsay. An out-of-court statement is not hearsay, however, if it is offered for the limited purpose of explaining why a police investigation was undertaken . . . . Because the government offered the detective's testimony to explain why Brown and Williams were placed under surveillance, we conclude the evidence was properly admitted.

*Id*. at 111.

This rationale, particularly allowing "tips" and other evidence in to explain to the jury why an investigative event began or occurred, has been a part of Eighth Circuit law for decades.  *See, e.g.*, *Garrett v. United States*, 78 F.3d 1286, 1306 (8th Cir. 1996) (citing

20

*Brown* and other cases while affirming non-hearsay use of out-of-court anonymous tip: "This Circuit has consistently held that an out-of-court statement is not hearsay 'if it is offered for the limited purpose of explaining why a police investigation was undertaken.'"); *United States v. Cruz*, 993 F.2d 164, 169 (8th Cir. 1993) (holding informant tip admissible non-hearsay because it was offered "as preliminary information concerning the origin of [the officer's] investigation" of the defendant and not for the truth of the matter asserted).[17]

Unlike many anonymous tips, the information in this case was corroborated by more than one source; one source was known and the other was from an established confidential informant.  In addition to the anticipated testimony of Ms. Tesar, the information otherwise will be introduced through Commander Kleszyk who received the tips that began the investigation.

###   D.      Rule 404(b) Evidence of Other Crimes, Wrongs, or Acts

The government moves *in limine* to admit as Rule 404(b) evidence the testimony of Detective Trump and other evidence of McClendon's prior controlled substances convictions of delivery of heroin and possession with intent to deliver cocaine.  In that case, McClendon was charged in West Virginia and pled guilty to both charges on February 11, 2019 and was sentenced to a range of one-to-fifteen years of imprisonment.

---

[17]    Showing the jury what drove an investigation is a key aspect of any trial presentation. Thus, the non-hearsay purpose of explaining a police investigation has included circumstances outside of an anonymous tip, such as an out-of-court complaint or police report. *See, e.g.*, *United States v. Marrowbone*, 211 F.3d 452, 456 (8th Cir. 2000) (out-of-court complaint alleging rape was admissible non-hearsay when offered to show "the origin of the investigation—not for the truth of the matter asserted.").

Evidence related to the West Virginia investigation and conviction is admissible to demonstrate McClendon's opportunity, intent, knowledge, absence of mistake, and lack of accident in conspiring with others to distribute controlled substances. The Rule 404(b) evidence includes certified copies of McClendon's conviction records and testimony from Detective Mark Trump, a TFO with the Drug Enforcement Agency (DEA). Detective Trump served as the lead case agent for the West Virginia investigation which ultimately led to McClendon's 2019 charge and conviction. Detective Trump has first-hand knowledge of defendant's conduct underlying his conviction.

Evidence of prior bad acts may not be offered to prove the defendant's criminal disposition, but is admissible to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *United States v. Jackson*, 278 F.3d 769, 771 (8th Cir. 2002) (quoting Fed. R. Evid. 404(b)). "Although Rule 404(b) excludes propensity evidence lacking an admissible purpose, we consider the rule one of inclusion." *United States v. Turner*, 781 F.3d 374, 389 (8th Cir. 2015). Such evidence is admissible if it (1) is relevant to a material issue; (2) is similar in kind and not overly remote in time to the crime charged; (3) is supported by sufficient evidence; and (4) the potential prejudice does not substantially outweigh its probative value. *Jackson*, 278 F.3d at 771 (quoting *United States v. Green*, 151 F.3d 1111, 1113 (8th Cir. 1998)).

While the government does not know exactly what McClendon's defense will be, it may be a "mere presence" argument or that McClendon was acting alone and not part of a conspiracy. McClendon's intent and knowledge regarding the various controlled substances and his association with others involved in drug distribution will be a material

issue at trial and evidence of McClendon's state of mind will be key.  A defendant places his state of mind at issue where he generally denies the allegations against him.  *See United States v. Thomas*, 58 F.3d 1318, 1321 (8th Cir. 1995) (holding that 404(b) evidence is admissible when defendant places his state of mind at issue, even if done through a general-denial defense); *see also United States v. Monds*, 945 F.3d 1049, 1052 (8th Cir. 2019), c*ert. denied*, 140 S. Ct. 2836 (2020), and *reh'g denied*, 141 S. Ct. 466 (2020) ("Monds placed both elements at issue, by means of a general denial, and by suggesting specifically that the drugs may have belonged to Johnson . . .").  Here, McClendon has denied the allegations against him, and it is likely that he will suggest the drugs in hotel Room 111 belonged to Scot Watkins.  The proposed Rule 404(b) evidence directly addresses this defense in that it suggests McClendon is intimately familiar with poly-substance distribution schemes and is more likely Watkins' co-conspirator rather than an innocent bystander.  *See United States v. Sykes*, 977 F.2d 1242, 1246 (8th Cir. 1992) (noting that evidence of prior offense involving same drug was relevant in showing knowledge and intent for charged offense).

Moreover, the conduct underlying McClendon's 2019 conviction is almost identical to the conduct charged here.  Detective Trump will testify that defendant's 2019 conviction involved a plea to delivery of a controlled substance (heroin) and possession with intent to deliver a controlled substance (cocaine) involving at least one other co-conspirator.  The plea followed an investigation of drug trafficking in West Virginia by traffickers from the Detroit area.  Similar to Bemidji, traffickers are known to travel to certain communities in West Virginia near a vulnerable customer base, to stay at a hotel or residence owned by a

local addict, and to sell drugs for several days before returning to Detroit to resupply. Such traffickers are known to then return with other associates to deal more drugs. McClendon was in an apartment where a search warrant was executed following a controlled substance buy at a local hotel by a CRI. Law enforcement found several types of drugs, including fentanyl, and other indications of drug trafficking, including cash, scales, and guns. McClendon escaped through a back window but was intercepted by perimeter security. These facts are strikingly similar to the instant case and demonstrate a common mode of operation, knowledge, and intent by the defendant. They show that McClendon's conduct in March 2021 was knowing and intentional, not a mistake or accident, and that he had the opportunity to acquire fentanyl specifically.

Furthermore, the conduct is recent in time having occurred in 2017 and 2018 with the final conviction in 2019. The defendant was incarcerated through November 2019 and was involved in the criminal conspiracy charged here less than two years later.

Finally, McClendon's plea agreement documented his admission to possessing with intent to deliver and delivering at least two different controlled substances. Evidence of a similar past crime, in a case where intent is the main issue, is clearly more probative than prejudicial and would assist the jury in assessing McClendon's state of mind in March 2021. Any concerns the defense has with prejudicial consideration of the Rule 404(b) evidence can be addressed through a limiting instruction. *See, e.g.*, *Thomas*, 398 F.3d at 1063 ("[T]he use of a limiting instruction decreases the danger that unfair prejudice will result from admission of the [404(b)] evidence. Here the district court gave a limiting instruction to the jury that the evidence could be used only on the issue of intent, not to

show that Thomas would be more likely to have committed this offense if he had committed similar acts in the past.")  The government has included a limiting instruction for that purpose in its proposed jury instructions.  *See* Manual of Model Criminal Jury Instructions for the Eighth Circuit, § 2.08.

### E.      Rule 609 Impeachment

Contemporaneous with this trial memorandum, the government has filed a notice that if McClendon elects to testify, it will seek to impeach his credibility by using his West Virginia felony conviction.

Where, as here, the credibility of a testifying defendant is a key consideration in the case, the Unit ed States may use a defendant's prior felony convictions to impeach defendant's credibility.  If defendant chooses to testify, he will likely attempt to offer testimony that contradicts the account of the government's testimony.  Accordingly, credibility will be a key factor in this case.

McClendon's convictions are "highly probative of his credibility 'because of the commonsense proposition that one who has transgressed society's norms by committing a felony is less likely than most to be deterred from lying under oath.'"  *United States v. Headbird*, 461 F.3d 1074, 1078 (8th Cir. 2006) (overruled on other grounds).  The Eighth Circuit has approved the use of felony convictions to impeach witnesses under Federal Rule of Evidence 609(a)(1). *See, e.g.*, *United States v. El-Alamin*, 574 F.3d 915, 926 (8th Cir. 2009); *United States v. Jackson*, 696 F.2d 578, 589 (8th Cir. 1982) (allowing for impeachment purposes proof of conviction for felon in possession in trial charging defendant with conspiracy and mail fraud).

25

In affirming the district court's decision to admit proof of prior convictions for impeachment, the Eighth Circuit has noted that the probative value of such impeachment evidence is particularly high where, as here, the jury will be asked to determine the credibility of competing stories by defendant and the government witnesses. *See Headbird*, 461 F.3d at 1078.

The United States should be allowed to cross-examine defendant regarding his prior felony convictions. The United States would propose to limit its cross-examination to the fact and nature of defendant's prior felony offenses as approved by the Eighth Circuit in *Headbird*. 461 F.3d at 1078. The government has included a limiting instruction for that purpose in its proposed jury instructions. *See* Manual of Model Criminal Jury Instructions for the Eighth Circuit, § 2.16.

### F.    Potential Penalties

Sentencing is within the province of the court, not the jury. This Court should preclude McClendon from introducing evidence, making argument, or otherwise mentioning the potential penalties he faces if convicted, including a five-year mandatory minimum sentence. The Eighth Circuit unequivocally has held that "arguing punishment to a jury is taboo." *United States v. Fenner*, 600 F.3d 1014, 1023 (8th Cir. 2010) ("We agree with the Government that any reference to sentencing would have been improper."). Such argument or evidence concerning punishment is improper because the law is well-settled that the potential penalty faced by a defendant is irrelevant to the jury's determination of guilt or innocence. *See, e.g.*, *Shannon v. United States*, 512 U.S. 573, 579 (1994) ("It is well established that when a jury has no sentencing function, it should be

26

admonished to 'reach its verdict without regard to what sentence might be imposed.''') (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)).  Mention of the potential penalties McClendon faces would serve only the improper purpose of jury nullification.

In addition to prohibiting mention to the specific sentence the defendant faces, such a prohibition also should include what is becoming a more common theme in defense arguments that the defendant is "on trial for his life," or that the defendant's "freedom" hangs on the outcome of the jury's decision, or similar arguments.  Each invites the jury to consider the penal consequences of a conviction on a defendant and, therefore, is wholly improper.  Accordingly, McClendon should be precluded from in any way mentioning potential penalties or questioning witnesses about them.

### G.      Motion To Sequester Witnesses

The government also moves to sequester potential witnesses except for the government's case agents, Task Force Officers Justin Erickson and Joe Kleszyk, and witnesses designated as experts.  Federal Rule of Evidence 615 allows the exclusion of witnesses at the "request of a party."  This rule does not authorize exclusion of (1) a party who is a natural person, (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, or (4) a person authorized by statute to be present.  Government agents and expert witnesses fall within the exceptions to this rule.  *United States v. Sykes*, 977 F.2d 1242, 1245 (8th Cir. 1992); *United States v.*

*Conners*, 894 F.2d 987, 991 (8th Cir. 1990).  Furthermore, this is TFO Erickson's first federal trial and Commander Kleszyk has offered to assist him in that role.

     **H.**    **Summary Evidence and Testimony**

     Pursuant to Rule 1006 of the Federal Rules of Evidence, the government <u>may</u> use summary charts related to two aspects of this case.  First, if necessary, the government may explain and describe certain phone records through summary schedules that it will offer into evidence pursuant to Rule 1006.  These exhibits shall include a selection of text communications and phone records, in part to avoid potentially prejudicial evidence. These records and summary documents will be explained by TFO Erickson during his testimony after proper foundation has been laid by the relevant forensic analyst.  All phone content has been provided to McClendon. Drafts of the summary exhibits, if used, will be provided to the defendant.  A copy of the final summary exhibits, as well as all documentary exhibits, will be provided to the Court and counsel in advance of trial, unless modified during the trial proceedings.

     Second, the government intends to introduce a chart to summarize the information from the drug testing of those objects seized on March 12, 2021.  The summary chart is anticipated to contain the type and weight of the controlled substance and where it was found.  It will be introduced by TFO Erickson or Kleszyk who had primary responsibility for handling, photographing, documenting, and storing evidence.

     Summary evidence is properly admitted when (1) the charts "fairly summarize" voluminous trial evidence; (2) they assist the jury in "understanding the testimony already introduced"; and (3) "the witness who prepared the charts is subject to cross-examination

with all documents used to prepare the summary." *United States v. King*, 616 F.2d 1034, 1041 (8th Cir. 1980).  All three of these criteria will be met in this case, and the use of summary charts in the manner proposed by the government is proper.

As indicated by the foregoing explanation, the government intends to have TFO Erickson, as the case agent, testify as a summary witness on drug and phone evidence in this case.  "The testimony of a summary witness may be received so long as she bases her summary on evidence received in the case and is available for cross-examination."  *Id.* TFO Erickson's summary testimony will be proper because the underlying data, namely the forensic phone recoveries involved, are too voluminous (for example, the Cellebrite report of McClendon's Apple iPhone is more than 50,000 pages) to be examined in court. The forensic recoveries, however, will be admitted into evidence, have been disclosed to McClendon, and the defendant will have the opportunity to cross examine TFO Erickson.

## I.      Drug Trafficking Expert

The government will introduce expert testimony to assist the jurors in understanding the business aspects of drug trafficking, including the tools of the trade, which may be unfamiliar to them.  The government has notified the defendant of its intention to call BCA Special Agent and Drug Enforcement Agency (DEA) Task Force Officer Michael Flanagan as its primary drug expert in this case.  SA Flanagan has testified as an expert in dozens of state and federal drug trials.  SA Flanagan's expert testimony will describe the nature of the drug trafficking business and roles within, the cash-intensive nature of that business, the prices and amounts of narcotics that would be considered a "distribution" amount rather than for personal use, methods of concealment and law enforcement evasion that are used

in the drug trafficking business, methods of communication and distribution in the drug trafficking business, and other information relevant to the jury's determination about whether the defendant conspired to possess and distribute controlled substances in March 2021.

"The business of drug trafficking and the *modus operandi* of drug dealers are matters unfamiliar to jurors." *United States v. Robertson*, 387 F.3d 702, 704 (8th Cir. 2004). Relying on Rule 702 of the Federal Rules of Evidence, which permits testimony from experts with special knowledge, experience, or skills when such testimony can assist jurors in understanding issues that are relevant to a case, courts have commonly accepted the type of expert testimony the government intends to introduce through SA Flanagan because it can help jurors understand the drug trafficking business. *See id.* (holding the district court did not err in allowing expert testimony from police officers that the amount of narcotics possessed by the defendant was a distribution amount, and that dealers selling such amounts typically carry a gun to protect themselves from being robbed by other drug dealers; evidence helped convict the defendant of possession with intent to distribute crack cocaine and possession of a firearm during and in relation to a drug trafficking crime); *United States v. Solorio-Tafolla*, 324 F.3d 964, 965 (8th Cir. 2003) (allowing expert testimony on drug quantities obtained for personal use); and *United States v. Newton*, 31 F.3d 611, 613 (8th Cir. 1994) (permitting expert testimony on the use of firearms by drug dealers).

SA Flanagan has been involved with law enforcement for nearly two decades, including a combined decade of assignments with the DEA as a task force officer—an

assignment he holds today.  His law enforcement career further includes multiple years in the Minnesota State Patrol (including as highway drug interdiction and canine handler for criminal interdiction) before being recruited into the Minnesota BCA.  The majority of SA Flanagan's law enforcement experience has focused on controlled substance crimes, and he has been exposed to almost all types of investigations.  His career has included multiple awards for his exemplary service, especially in the realm of narcotics investigation. Moreover, SA Flanagan has previously testified as the government's primary drug trafficking expert in this District.  SA Flanagan's anticipated testimony is relevant to material issues the jury must decide, and it will greatly aid the jury in understanding the evidence in this case.

## VII.   DEFENSE

The government is not aware of any potential defenses the defendant intends to raise or assert at trial.  However, the government has received notice that McClendon intends to use his records from the Michigan Office of Labor and Economic Opportunity and Scot Watkin's red iPhone as his exhibits in his defense.  The government has also received notice that McClendon plans to call Investigator Lyndsey Chase from Watertown, Minnesota and a records custodian from the Michigan Office of Labor and Economic Opportunity, however, no description of their testimony has been provided.

Based on the defendant's exhibit and witness list, the government expects that the defendant may argue that he was merely present or an innocent bystander and that the significant amounts of cash he wired to his girlfriend were unemployment payments.  The defendant has not produced any unemployment records in discovery.

At present, the government believes the defense will maintain a lack of knowledge, motive, or intent or may appeal for jury nullification.  Any appeal for jury nullification or language implicating such would be improper argument.

## VIII.  PRE-TRIAL STATUS CONFERENCE

The government has filed multiple motions *in limine* in tandem with this trial brief. The government will be prepared to argue them at the June 13 hearing.  In addition, the government requests an opportunity to put on the record McClendon's rejection of its last plea offer, which would eliminate a mandatory minimum sentence.

Dated: June 6, 2022

Respectfully Submitted,

Andrew M. Luger
UNITED STATES ATTORNEY

*s/Angelica Ramirez*

BY:  Angelica D. Ramirez
Special Assistant United States Attorney
Attorney ID No. 3097652
Laura M. Provinzino
Assistant United States Attorney
Attorney ID No. 0329691